UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| PEORIA PROPERTY INVESTMENTS LLC, | ) ) ) |
| Plaintiff/Counterdefendant, | ) ) |
| v. | ) ) Case No. 19-cv-1198-JES-JEH |
| THE CINCINNATI INDEMNITY COMPANY, | ) ) ) ) |
| Defendant/Counterclaimant. | ) ) |

# ORDER AND OPINION

This matter is now before the Court on Defendant/Counterclaimant The Cincinnati Indemnity Company's Motion for Judgment on the Pleadings. D. 14. [1] Plaintiff/Counterdefendant Peoria Property Investments LLC filed a Response in opposition. D. 17. Defendant was granted leave to file a Reply to address an argument raised in Plaintiff's Response. D. 19. Plaintiff was granted leave to file a Sur-Reply. D. 21. For the reasons set forth below, Defendant's Motion is DENIED.

## BACKGROUND

This action stems from an insurance coverage dispute between Plaintiff/Counterdefendant Peoria Property Investments ("Peoria") and Defendant/Counterclaimant The Cincinnati Indemnity Co. ("Cincinnati"). Plaintiff alleges Cincinnati breached an insurance contract when it refused to cover Peoria's claim. Plaintiff seeks damages and declaratory relief. D. 4, at 1. Cincinnati filed a counterclaim seeking a declaratory judgment that Cincinnati has no duty to indemnify Peoria in relation to its claim. D. 8. Cincinnati now moves for judgment on the

---

[1] Citations to the Docket in this case are abbreviated as "D. __."

1

pleadings and dismissal of Plaintiff's Complaint. D. 14.

Peoria purchased a commercial property insurance policy from Cincinnati that was effective from December 17, 2016 to December 17, 2017, (the "Policy"). D. 4, at 2. The Policy covered a nine-story building located at 222 N.E. Monroe St., Peoria, IL 61602 (the "Property"). *Id.* at 3. The building consists of commercial offices on the first floor, a six-floor parking tower on floors two through seven, and more commercial offices on floors eight and nine. *Id.*

On or about June 20, 2017, Peoria submitted a claim under the Policy reporting a "large boom" occurred at the Property on June 16, 2017. D. 11, at 6. Concurrent with the boom, Peoria reported the building was felt shaking. *Id.* A subsequent inspection revealed the ceiling in the northwest corner of the fourth level and the corresponding floor of the fifth level of the parking structure had displaced downward approximately eight inches. D. 4, at 3. As a result, Peoria could not permit vehicles to park in the impacted portions of the parking deck. *Id.* Peoria estimated the cost to repair the Property exceeded one million dollars. *Id*.

Cincinnati retained Engineering Systems, Inc. ("ESI") to inspect and evaluate the Property. D. 11, at 6. ESI documented the concrete slab in the displaced area "had dropped downward as much as eight inches"; "[t]he ends of the joists were separated from the main beam"; and "[t]here were cracks on the top side of the slab consistent with outward displacement of the cantilever… ." D. 8-1, at 4. Additionally, ESI observed many areas throughout the parking structure of the Property where reinforcing bars were exposed due to "significant deterioration in the concrete" and noted previous repairs were not done properly. *Id.* In its report, ESI stated the following:

### **Overview of the Distress**

> The cantilever elevated garage slab on the northwest face of the structure at Level 5 is severely distressed and has displaced as much as 8 inches at

> one location. There are also many locations where the structure has severe deterioration issues.
>
> **Cause of the Distress**
>
> The cantilever section has pulled loose from the adjoining slab. The loud noise that was heard was most likely the tensile rupture of the reinforcing bars slab. The condition of the cantilever slab and this mode of distress is consistent with corrosion of the reinforcing bars embedded in the slab. The reinforcing bars are embedded in the slab to carry the tensile forces that occur in the floor system. The corrosion of the reinforcing bars results in a reduction in the reinforcing bar diameter (i.e. makes them smaller) which reduces their load carrying capacity. The diameter eventually gets reduced to the point where the bars essentially snap.

*Id.* at 5-6. ESI said a structural assessment for the entire parking structure was necessary due to "corroded reinforcing bars, spalled concrete and floor cracks." *Id.* at 6. ESI recommended the installation of a chain link fence to prevent any vehicles from inadvertently entering the displaced area; the installation of a complete shoring system to support the displaced slab; the development of a plan to demolish and replace the displaced slab; and the development of a maintenance plan for future repairs. *Id.*

The Policy will pay for any direct physical loss to the insured property "caused by or resulting from a Covered Cause of Loss." D. 4-1, at 19. Direct physical loss will not be covered if the loss is enumerated in the exclusions or limitations provisions. *Id.* at 21. The Policy excludes loss caused by "[r]ust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself" and "[s]ettling, cracking, shrinking or expansion" *Id.* at 23-4. However, the Policy also contains a provision wherein it extends coverage for loss due to the collapse of a building. *Id.* at 35. In that instance, the loss may be covered if the collapse is caused by decay hidden from view. The coverage extension for loss due to collapse states:

> **c. Collapse**
>
> (1) With respect to buildings:

> (a) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its intended purpose.
>
> (b) A building or any part of a building that is in imminent danger of collapse is not considered to be in a state of collapse.
>
> (c) A building that is standing or any part of a building that is standing is not considered to be in a state of collapse even if it:
>
>> 1) Has separated from another part of a building; or
>>
>> 2) Shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinking or expanding.
>
> (2) We will pay for "loss" to Covered Property, caused by collapse of a building or any part of a building insured under this Coverage Part, if the collapse is caused by one of more of the following:
>
> \* \* \*
>
> (b) Decay that is hidden from view, unless the presence of such decay is known or should reasonably have been known to an insured prior to collapse;
>
> \* \* \*

D. 4-1, at 35.

In its Answer to the Counterclaim, Peoria admitted the loss to the Property was caused by decay hidden from view. D. 11, at 8. Peoria claimed the ESI report shows the Property's parking structure collapsed and, therefore, it is covered by the Policy's Collapse Coverage Extension. *Id.* Cincinnati denied the claim on July 19, 2017. D. 4, at 3. Cincinnati said the loss was not covered under the Policy because it was within the terms of various coverage exclusions in the Policy, including those for deterioration, defective construction and maintenance. D. 8, at 8.

### LEGAL STANDARD

A party may move for judgment on the pleadings after pleadings are closed but early enough not to delay trial. Fed. R. Civ. Pro. 12(c). A Rule 12(c) motion is governed by the same

standard as motions to dismiss for failure to state a claim under Rule 12(b)(6). *Lodholtz v. York Risk Servs. Group*, 778 F.3d 635, 639 (7th Cir. 2015). However, if the movant is attempting to dispose of the case based on the underlying substantive merits, then it is appropriate to apply the same standard as if it were a motion for summary judgment. *Mid-Century Ins. Co. v. Pizza by Marchelloni*, 2018 U.S. Dist. LEXIS 78859 *2, 2018 WL 2158758 (C.D. Ill. 2018) (citing *Alexander v. City of Chicago*, 994 F.2d 333, 336 (7th Cir. 1993)). As such, judgment on the pleadings may be granted only if the pleadings disclose no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.*

The parties agree Illinois law governs the interpretation of the insurance policy in this case. Under Illinois law, the Court must review the language of the policy to ascertain and give effect to the intention of the parties. *Founders Ins. Co. v. Munoz*, 237 Ill. 2d 424, 433, 930 N.E. 2d 999 (2010). The policy must be considered as a whole and every provision, rather than an isolated part, should be examined to determine whether an ambiguity exists. *Id.* at 433. If there are no ambiguities, then the policy must be construed according to the plain and ordinary meaning of its terms. *River v. Commercial Life Ins. Co.*, 160 F.3d 1164, 1169 (7th Cir. 1998). Any ambiguities in the provisions of an insurance policy are construed against the drafter of the contract, the insurer, and in favor of the insured. *Id.* "A court should not search for ambiguity where none exists. Mere disagreement about the interpretation of an insurance contact does not render it ambiguous." *Id.* (citation omitted). A policy provision may be considered ambiguous if the policy language is susceptible to more than one reasonable interpretation. *Founders*, 237 Ill. 2d at 433.

To withstand a motion for summary judgment in a lawsuit involving an insurer's failure to pay a claim under an all-risk insurance policy, the insured bears the initial burden of presenting

5

sufficient facts establishing a *prima facie* case. *Johnson Press of Am., Inc. v. Northern Ins. Co. of N.Y.*, 339 Ill. App. 3d 864, 871 (1st Dist. 2003) (citing *Wallis v. Country Mutual Ins. Co.*, 309 Ill. App. 3d 566, 570 (2nd Dist. 2000)). The insured must satisfy this burden by showing (1) a loss occurred, (2) the loss resulted from a fortuitous event, and (3) an all-risk policy covering the property was in effect at the time of the loss. *Id.* Once the insured establishes a *prima facie* case, the burden "then shifts to the insurer to show that the loss resulted from a peril expressly excluded from coverage." *Id.* (citing *Wallis*, 309 Ill. App. 3d at 570). Provisions in an insurance policy that exclude or limit coverage must be construed liberally in favor of the insured. *Id.*

## DISCUSSION

The parties agree the abrupt downward displacement of the concrete slab some eight inches was caused by decay, though Peoria claims it was hidden from view. The Court need not address whether the decay was hidden from view and whether Peoria knew of the decay or should reasonably have known of it. Those are questions of fact that are only material for summary judgment if the Court finds the Property collapsed as defined by the Policy. As stated above, the Policy excludes loss caused by decay or corrosion; however, an exception to that exclusion extends coverage in the event of collapse caused by hidden decay. The collapse coverage extension, and more specifically the definition of collapse, is the crux of the issue currently before the Court.

Cincinnati moves for judgment on the pleadings because it claims there are no genuine issues of material fact and it is entitled to judgment as a matter of law. D. 14. Cincinnati points to Peoria's admission that the loss was caused by decay and states that the coverage extension for collapse of buildings does not apply here. *Id.* Because the Property is still standing, Cincinnati argues it has not collapsed as defined in the Policy. D. 19, at 3. Instead, the Property must lose its

6

basic character or be beyond repair to be considered collapsed. *Id.* Cincinnati states the coverage extension does not apply even though a portion of the Property sustained structural damage and may be in imminent danger of collapse. *Id.* at 4.

Peoria asks the Court to deny Cincinnati's motion and find the Property collapsed as a matter of law. D. 17, at 2. It argues the damage to the parking structure falls squarely within the plain language of Policy's definition of collapse, thereby making the coverage extension applicable. *Id*. Peoria argues in the alternative that if the Court finds the building must "completely fall down" to meet the collapse definition, then it must find the coverage extension provision is susceptible to more than one reasonable interpretation. *Id.* Any ambiguous provision must be construed against Cincinnati and in favor of coverage. *Id.*

Both parties discuss *Gulino v. Economy Fire & Casualty Co.*, 2012 IL App (1st) 102429, 971 N.E.2d 522, though they disagree on its application to the instant case. In that case, Gulino filed a claim under his homeowner's insurance policy after his basement ceiling displaced downward about eight inches. *Id.* at 525. The claim was denied on the grounds that the damage to the ceiling did not constitute a collapse as defined by the policy. *Id.* The policy defined collapse as:

> … an abrupt falling down or caving in of a building or any part of a building. Collapse does not include settling, cracking, sagging, bowing, ending, leaning, shrinking, bulging or expansion. A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

*Id.* at 524. After his claim was denied, Gulino filed a complaint against the insurer for breach of contract. *Id.* at 525. The trial court granted summary judgment in favor of the insurer; however, the appellate court reversed after a careful review of the policy. *Id.* at 527, 530.

7

The appellate court examined the policy's definition of collapse and specifically its inclusion of the term "caving in," which was not defined in the policy. *Id.* at 527. The court used a dictionary to apply a plain and ordinary meaning of "caving in" and found the term indicates "the undermining of a structure that can be something less than a complete falling down." *Id.* at 528. It found the terms "falling down" and "caving in" were "separate and distinct and must be considered separately as a trigger of coverage." *Id.* (internal quotations omitted). Thus, while Gulino's house or any part of it had not completely fallen down, the court found a portion of the basement ceiling had caved in. *Id.* As a result, the damaged basement ceiling was considered collapsed under the policy. *Id.* The matter was remanded because there remained a genuine issue of material fact as to what caused the ceiling to collapse. *Id.* at 530.

Here, the facts are comparable to those in *Gulino*. A concrete slab displaced downward about eight inches but did not fall completely. Peoria filed a claim, which Cincinnati denied because it was not a loss covered by the Policy. Peoria maintains the loss is covered by the coverage extension for collapse. The Policy here defines collapse in a manner almost identical to the *Gulino* policy, except for two important distinctions. First, subsection c(1)(a) of the Policy defines collapse as "an abrupt falling down or caving in of a building or any part of a building *with the result that the building or part of the building cannot be occupied for its intended purpose*." D. 4-1, at 35 (emphasis added). The *Gulino* policy did not specify there must be an inability to occupy the building or portion thereof for its intended purpose. Second, the *Gulino* policy did not contain the language in subsection c(1)(c), which states a building or any part of a building "that is standing" and "[h]as separated from another part of a building" is not in a state of collapse. *Id.*

The appellate court's analysis of the term "caving in" is instructive. Subsection c(1)(a) of

8

the Policy defines collapse as "an abrupt falling down or caving in." Like the *Gulino* policy, the inclusion of the term "caving in" suggests it is separate and distinct from the term "falling down" and it will be treated as a separate trigger for coverage under the collapse extension. Further, the phrase "with the result that the building or part of the building cannot be occupied for its intended purpose" suggests the drafters of the Policy intended the definition of collapse to include less than a complete falling down. A building that has fallen down could never be occupied for its intended purpose, but a building that has caved in could potentially be occupied. The inclusion of this phrase suggests the building cannot simply cave in to be considered collapsed under the Policy; it must be to the point that it impossible to occupy the building or a part thereof for its intended purpose.

Here, the evidence suggests a portion of the Property abruptly caved in and as a result, it cannot be occupied for its intended purpose. The loud boom and concurrent shaking indicate the loss was abrupt. An eight-inch displacement of the concrete slab is indeed something less than a complete falling down. That portion of the Property has clearly been undermined since no one has been allowed to park there since June 16, 2017. This is bolstered by the ESI report, which recommended installing a chain-link fence to prevent anyone from inadvertently parking in that area until the displaced slab could eventually be demolished and replaced. Peoria has made a *prima facie* case that a portion of the Property collapsed when it abruptly caved in. The burden now shifts to Cincinnati to show the loss is not covered because of limitations or exclusions within the provisions that extend coverage for collapse. *Johnson Press*, 339 Ill. App. 3d at 871.

Subsections c(1)(b) and c(1)(c) clarify when a building is not considered to be in a state of collapse and act as limitations on the coverage extension for collapse. Subsection c(1)(b) explains that a building or any part of one "in imminent danger of collapse" is not in a state of

9

collapse. Here, Peoria's claim concerns a portion of Property that has already collapsed, not one in imminent danger of doing so. Subsection c(1)(c) states a building or any part of it "that is standing" is not in a state of collapse even if it "[h]as separated from another part of a building" or if it shows signs of "cracking, bulging, sagging, bending, leaning, settling, shrinking or expanding." Cincinnati claims subsection c(1)(c) supports its assertion that the building must "fall[] in pieces" or become a "mass of rubbish" to be considered collapsed. D. 19, at 5. Cincinnati argues the Property is still standing and a portion of the parking garage separated from the building; therefore, it has not collapsed. *Id.* at 6. As discussed above, the definition of collapse does not require a building or any portion of a building fall to the ground. Since subsection c(1)(c) limits coverage under the collapse provisions, it must be construed liberally in favor of Peoria.

Since collapse is defined as "an *abrupt* falling down or caving in," subsection c(1)(c) could be interpreted as applying only to loss that occurs over a more gradual period of time. Another interpretation of subsection c(1)(c) could look to the inclusion of the term "standing" and one could reasonably conclude this subsection does not apply to loss caused by collapse because a building or any part of one that has collapsed is no longer standing. The Policy does not define the term "standing" so it must be given its plain and ordinary meaning, which can be derived from a dictionary. *Gulino*, 971 N.E. 2d at 528. Merriam-Webster defines the adjective "standing" as "upright on the feet or base: erect"; "remaining at the same level, degree, or amount for an indeterminate period"; "continuing in existence or use indefinitely"; and "not movable."[2] https://www.merriam-webster.com/dictionary/standing (last visited Jan. 24, 2020). A building or any part of one that has collapsed is not at the same level or degree as before the

---

[2] Merriam-Webster provides three additional definitions of "standing" (adj.) that are not applicable: "not yet cut or harvested"; "not flowing: stagnant"; "established by law or custom"; and "done from a standing position."

collapse. Since any provisions in an insurance policy that exclude or limit coverage must be construed liberally in favor of the insured, the Court finds Cincinnati has not met its burden of showing the loss is not covered by the Policy's exception that extends coverage in the event of a collapse.

There also remains a genuine issue of material fact concerning whether the decay that caused the collapse was hidden from view, and whether Peoria knew of the decay or should reasonably have known of it. As such, the Court cannot conclude whether the loss is covered by the collapse coverage extension and Cincinnati's request for a declaratory judgment in its favor must be denied.

## CONCLUSION

For the reasons set forth above, Defendant/Counterclaimant The Cincinnati Indemnity Company's Motion [14] for Judgment on the Pleadings is DENIED.


Signed on this 31st day of January, 2020.

                                              s/James E. Shadid
                                              James E. Shadid
                                              United States District Judge